IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| KYEESHAH WRIGHT, ET AL. | : | |
| | : | |
| | : | CIVIL ACTION |
| v. | : | |
| | : | NO. 10-1102 |
| CITY OF PHILADELPHIA ET AL. | : | |
| | | |
| JACQUELINE LISA GOINS, ET AL. | : | |
| | : | |
| | : | CIVIL ACTION |
| v. | : | |
| | : | NO. 11-5990 |
| CITY OF PHILADELPHIA ET AL. | : | |
| SHENIA BANKS | : | |
| | : | |
| | : | CIVIL ACTION |
| v. | : | |
| | : | NO. 12-114 |
| CITY OF PHILADELPHIA, ET AL. | : | |

SURRICK, J.                                                        MARCH  2 , 2015

### MEMORANDUM

Presently before the Court are Defendants' Motions to Dismiss.  (Wright ECF No. 13;

Wright ECF No. 14; Goins ECF No. 8; Goins ECF No. 9; Banks ECF No. 2.)  For the following

reasons, Defendants' Motions will be granted in part and denied in part.

## I.    BACKGROUND

### A.    Procedural History

On May 21, 2010, Plaintiff Kyeesha Wright, on behalf of herself and her three children,

Plaintiffs Emira Wright, Tatyanna Wright, and Malik Singleton-Wright, filed an amended

complaint alleging claims against Defendant Philadelphia Housing Authority ("PHA"), and PHA

employees Defendants Carl R. Greene, Carolyn Carter, Daniel J. Quimby, Keith Caldwell, William Emmitt, and David Tillman.[1]  (Wright Compl., Wright ECF No. 11.)  This lawsuit arises out of Plaintiffs' exposure to asbestos from September 2009 until January 2010.  The Wright Complaint sets forth claims under *Monell v. Department of Social Services*, 436 U.S. 658 (1978) (Count I), state-created danger (Count II), annual medical monitoring (Count III), violations of 42 U.S.C. § 1983, the United States and Pennsylvania Constitutions, and Pennsylvania laws (Counts IV-VII),[2] and state-law negligence, battery, and future medical monitoring (Count VIII).  On July 19, 2010, Defendants PHA, Carter, Quimby, Caldwell, Emmitt, and Tillman filed a Motion to Dismiss.  (PHA Defs.' Mot. Dismiss, Wright ECF No. 14.)  Defendant Greene joined the Motion and filed a separate Motion to Dismiss.  (Greene Def.'s Mot. Dismiss, Wright ECF No. 13.)  Wright filed a response on August 26, 2010.  (Pls.' Resp., Wright ECF No. 18.)

On September 22, 2011, Plaintiff Jacqueline Lisa Goins, on behalf of herself and her daughter Naeem Curtis Goins, filed a complaint that is identical to the Wright Complaint in all material respects.  (Goins Compl., Goins ECF No. 1.)  The Goins Complaint added one additional defendant, Michael P. Kelly, who succeeded Greene as PHA's Administrative Receiver and Executive Director.  (Goins Complaint ¶¶ 8-9.)  On November 8, 2011, Defendants filed a Motion to Consolidate the Goins Complaint and the Wright Complaint.  (Goins ECF No. 5.)  On November 22, 2011, Judge Thomas N. O'Neill granted Defendants' motion and ordered that the cases be consolidated.  (Goins ECF No. 7.)  Defendants Greene, Kelly, PHA, Quimby,

_____

[1] On July 27, 2010, the claims against the City of Philadelphia were dismissed by a Stipulation approved by the Court.  (*See* Wright ECF Nos. 15, 16.)

[2] Specifically, Count IV is against PHA, Count V is against Greenee, Carter, Quimby, and Caldwell, Count VI is against Emmitt, and Count VII is against Tillman.

and Tillman subsequently filed a Motion to dismiss the Goins Complaint on December 8, 2011. (Goins ECF No. 8.)  Also on December 8, 2011, Defendants Caldwell, Carter, and Emmit filed a Motion to dismiss the Goins Complaint.  (Goins ECF No. 9.)  In both Motions, Defendants simply adopted and incorporated the PHA Defendants' Motion to Dismiss and Greene's Motion to Dismiss that were filed in Wright.  The Defendants did not raise new or additional arguments or issues.  In fact, Defendants just re-submitted the motions and briefs from Wright.

On January 10, 2012, Plaintiff Shenia Banks filed a complaint alleging claims identical to the Wright and Goins Complaints against all Defendants named in the Goins Complaint.  (Banks Compl., Banks ECF No. 1.)  The Banks Complaint concerned all of the same facts and circumstances in the Wright and Goins Complaints.  On February 21, 2012, Defendants filed a Motion to Dismiss the Banks Complaint.  (Banks ECF No. 2.)  Defendants again simply adopted and incorporated the PHA Defendants' Motion to Dismiss and Greene's Motions to Dismiss filed in Wright, without raising additional issues or arguments.  Banks filed a response on February 29, 2012, which simply adopts the response to the Motion to dismiss filed in the Wright case (ECF No. 4).  We have entered an Order consolidating the Banks case with the Wright and Goins cases.  (Case No. 10-1102, ECF No. 26.)

Despite the somewhat confusing procedural history here, the Motions before the Court are straightforward.  The same two motions to dismiss—the PHA Defendant's Motion to Dismiss and Greene's Motions to Dismiss—were submitted in the two consolidated cases and in the Banks case.  Because the facts of these cases are very similar, we will note differences only when they impact the legal analysis of the Motions.   Likewise, because the Motions themselves substantially overlap, we treat them separately only where they raise distinct arguments.

**B.      Factual Background**[3]

      **1.      *The Wright Complaint***

In September 2009, Wright resided with her three children in unit 517 in the Hill Creek
Apartments, which she leased from PHA.  (Wright Compl. ¶¶ 20-21.)  In September, PHA sent
maintenance workers to their home to repair a leaking pipe.  (*Id.* at ¶ 21.)  To fix the pipe, the
workers broke through a wall in their basement.  (*Id.* at ¶ 22.)  Rudy Barbosa, a PHA employee,
and Robert Smith, a construction worker, observed PHA plumbers tearing asbestos insulation off
pipes and tossing debris onto the apartment floor, sending asbestos particles and fibers in the air.
(*Id.* at ¶ 23.)  Defendant Emmitt, a PHA maintenance supervisor, was present during this
incident.  (*Id.* at ¶ 26.)  Smith complained to Emmitt about the presence of asbestos in the
apartment and the danger it presented.  (*Id.* at ¶ 26.)  Notwithstanding these complaints, Emmitt
directed Barbosa and Smith to scoop up the asbestos and the debris with a shovel and dump them
into the hole in the wall.  (*Id.* at ¶ 27.)  Barbosa and Smith then used drywall and plaster to patch
up the wall.  (*Id.* at ¶ 28.)  Unbeknownst to Emmitt, Smith photographed the scene and placed a
pile of the debris in a plastic bag.  (*Id.* at ¶ 29.)

Emmitt informed Wright that the "repairs were going well."  (*Id.* at ¶ 30.)  When Wright
inquired about "the little white stuff floating in the air," Emmitt responded that she did not need
to not worry about that.  (*Id.* at ¶ 31.)  Relying on Emmitt's assurance, Wright and her children
continued to reside in the apartment. (*Id.* at ¶ 32.)

On January 22, 2010, a reporter from the Philadelphia Daily News appeared at Wright's
door and informed her that her apartment may have an asbestos problem.  (*Id.*)  In the following

---

[3] For purposes of these Motions, the factual allegations in the Complaint are taken to be
true.  *See Rocks v. City of Phila.*, 868 F.2d 644, 645 (3d Cir. 1989).

weeks, the Asbestos Control Unit of the Philadelphia Health Department, the Environmental Protection Agency ("EPA"), and the Philadelphia Daily News inspected and tested the apartment for asbestos.  (*Id.* at ¶ 33.)  The testing performed by the Philadelphia Health Department revealed the presence of asbestos in Wright's basement.  (*Id.* at ¶ 34.)  The Department immediately sealed off the basement and affixed a bright orange warning sign to the door.  (*Id.*)  The testing done on behalf of the Philadelphia Daily News also found asbestos.  (*Id.* at ¶ 35.)  The "visual only" inspection performed on behalf of PHA found no asbestos.  At the time the Wright Complaint was filed, the EPA had not yet issued its findings.  (*Id.* at ¶ 36.)

PHA advised Wright to throw away all of the family's clothing and the Philadelphia Health Department recommended that Wright discard all of the personal property in her basement, including clothing, toys, and furniture.  (*Id.* at ¶¶ 38-39.)  Wright followed the Philadelphia Health Department's recommendation and discarded over $10,000 in personal property.  (Pls.' Resp. Ex. A.)  PHA retained an asbestos abatement contractor to repair the pipe insulation and clean out the basement.  (*Id.* at ¶ 38.)  The Philadelphia Health Department has required that Wright and her children vacate the premises.  At the time the Complaint was filed, Wright and her children had been living in temporary housing.  (*Id.* at ¶ 40.)

2.  *The Goins Complaint*

In September 2009, Goins resided with her daughter in apartment unit 515 in the Hill Creek Apartments, which was adjacent to Wright's apartment.  (Goins Compl. ¶¶ 19-20.)  When PHA maintenance workers were fixing leaking pipes in Wright's apartment, as described above, they broke through a wall in the basement that joined Wright's and Goins's apartments.   (*Id.* at ¶ 21.)  Goins was unaware of the scope of work performed in Wright's apartment until she read about it in the Daily News in February 2010.  (*Id.* at ¶ 30.)  After reading about the work done in

Wright's apartment, Goins spoke to Wright about it.  (*Id.* at ¶ 32.)  Wright informed Goins that the air in her basement had tested positive for the presence of asbestos.  (*Id.* at ¶ 33.)  She further informed Goins that her basement had been sealed off, that she was advised to discard clothing and other personal property that had been in the basement, and that she had been required to vacate the apartment for her safety and welfare.  (*Id.* at ¶¶ 33, 37-39.)  Goins then recalled that in the fall of 2009, she had observed airborne white materials in the air of her basement.  (*Id.* at ¶ 41.)

>    3.    *The Banks Complaint*

In September 2009, Banks resided in apartment unit 509 in the Hill Creek Apartments, which was adjacent to Wright's apartment.  (Banks Compl. ¶¶ 19-20.)  When PHA maintenance workers were fixing leaking pipes in Wright's apartment, as described above, they broke through a wall in the basement of Bank's apartment.  (*Id.* at ¶ 21.)  Banks was unaware of the scope of work performed in Wright's apartment until she discussed it with Wright in March 2010.  (*Id.* at ¶ 29.)  Wright informed Banks that her basement tested positive for the presence of asbestos. (*Id.* at ¶ 31.)  Wright also informed Banks that her basement had been sealed off and that the Philadelphia Health Department had ordered PHA to remediate the asbestos in her basement. (*Id.* at ¶ 34.)  Because of concern about possible asbestos contamination, Banks hired an independent contractor to do sampling and testing to determine if there was asbestos in her basement.  (*Id.* at ¶ 35.)  When the test occurred on July 20, 2010, asbestos fibers, debris and contamination were found to be present.  (*Id.* at ¶ 2.)

>    4.    *Defendants' Policies*[4]

---

[4] Plaintiffs each allege the same facts about Defendants' policies.  We cite only to the Wright Complaint.

Plaintiffs allege that from as early as 2004, Defendants have had a policy of failing to disclose the presence of asbestos in property owned and operated by PHA.  (Wright Compl. ¶ 45.)  Plaintiffs allege that Defendants have utilized unsafe and unlawful practices for disposing of and handling asbestos found in PHA properties.  (*Id.* at ¶ 46.)  In addition, Plaintiffs contend that Defendants punish PHA employees who complain about the dangerous methods of handling asbestos.  (*Id.* at ¶ 47.)

On February 1 and 2, 2010, the Philadelphia Daily News printed two articles about the incident that occurred at Wright's apartment and PHA's policies concerning asbestos removal.  (*Id.* at Exs. A & B.)  In the first article, Smith and Barbosa described how they followed the orders of their supervisor, Emmitt, and shoveled the exposed asbestos debris back into a hole in the wall.  (*Id.* at Ex. A.)  These practices, they maintain, were routine at the Hill Creek Apartments.  (*Id.*)  PHA general manager, Defendant Tillman, denied the allegations and dismissed Smith as a "disgruntled employee."  (*Id.*)  According to the second article, more than a dozen former and current PHA workers called the Daily News and described the incident at Wright's apartment as common.  (*Id.* at Ex. B.)  The workers contended that supervisors often ordered them to discard asbestos debris inside walls or toss it into PHA dumpsters.  (*Id.*)  Those who refused to comply were fired.   (*Id.* at Exs. A & B.)  The articles recount other similar incidents involving PHA employees.   (*Id.* at Exs. A & B.)

Plaintiffs argue that Defendants' policies regarding asbestos removal violate EPA regulations, Pennsylvania Department of Environmental Protection regulations, the Pennsylvania Asbestos Occupations Abatement Accreditation and Certification Act, and the Philadelphia Code.

## II.    LEGAL STANDARD

Under Federal Rule 8(a)(2), "[a] pleading that states a claim for relief must contain a

short and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ.

P. 8(a)(2).  Rule 12(b)(6) provides for the dismissal of a complaint, in whole or in part, for

failure to state a claim upon which relief can be granted.  *See* Fed. R. Civ. P. 12(b)(6).  A motion

under Rule 12(b)(6), therefore, tests the sufficiency of the complaint against the pleading

requirements of Rule 8(a).  "To survive a motion to dismiss, a complaint must contain sufficient

factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft

v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570

(2007)).  A complaint that merely alleges entitlement to relief, without alleging facts that show

entitlement, must be dismissed.  *See Fowler v. UPMC Shadyside*, 578 F.3d 203, 211 (3d Cir.

2009).  Courts need not accept "[t]hreadbare recitals of the elements of a cause of action,

supported by mere conclusory statements . . . ."  *Iqbal*, 556 U.S. at 678.  "While legal

conclusions can provide the framework of a complaint, they must be supported by factual

allegations."  *Id*. at 679.  This "'does not impose a probability requirement at the pleading stage,'

but instead 'simply calls for enough facts to raise a reasonable expectation that discovery will

reveal evidence of' the necessary element."  *Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 234 (3d

Cir. 2008) (quoting *Twombly*, 550 U.S. at 556).

In determining whether dismissal of the complaint is appropriate, courts use a two-part

analysis.  *Fowler*, 578 F.3d at 210.  First, courts separate the factual and legal elements of the

claim and accept all of the complaint's well-pleaded facts as true.  *Id*. at 210-11.  Next, courts

determine whether the facts alleged in the complaint are sufficient to show that the plaintiff has a
"'plausible claim for relief.'"  *Id*. at 211 (quoting *Iqbal*, 556 U.S. at 679).  Given the nature of
the two-part analysis, "'[d]etermining whether a complaint states a plausible claim for relief will
. . . be a context-specific task that requires the reviewing court to draw on its judicial experience
and common sense.'"  *McTernan v. City of York*, 577 F.3d 521, 530 (3d Cir. 2009) (quoting
*Iqbal*, 556 U.S. at 679).

## III.   DISCUSSION

### A.   Legal Harm under Section 1983

Defendants argue as a threshold matter that Plaintiffs have not suffered any legal harm.
This argument is based in part on Defendants' suggestion that Plaintiffs may not recover for
emotional distress arising out of their exposure to asbestos.  Defendants' argument stems from
Plaintiffs' allegations about the effect of asbestos exposure on their health.  (*See* Wright Compl.
¶ 42; Goins Compl.  ¶¶ 41-42; Banks Compl.  ¶¶ 35-36.)  Defendants describe this emotional
distress as the "sole harm averred" in the Complaints.  However, they included a footnote in their
Motion noting that Wright lost personal property in her basement because of the asbestos.  (*See*
PHA Defs.' Mot. Dismiss 11 & n.4.)

Defendants are correct that Plaintiffs may not recover for their emotional distress.  *See*
*Fontroy v. Owens*, 150 F.3d 239, 244 (3d Cir. 1998) (finding no § 1983 cause of action for
emotional distress caused by exposure to asbestos where plaintiff suffered no present physical
injury); *Simmons v. Pacor, Inc.*, 674 A.2d 232, 238 (Pa. 1996) (finding no recovery for
emotional distress caused by increased fear of cancer).

Plaintiffs admit that they have not manifested any physical injuries as a result of their
exposure to asbestos.  Indeed, Plaintiffs agree with Defendants that they may not bring suit for

emotional distress under these circumstances. Plaintiffs contend, however, that they sustained injuries in the form of property loss and expenses for future medical monitoring. We are satisfied that Plaintiffs have alleged legally cognizable harms.

Initially, Wright has properly made a claim for compensatory damages. Wright argues that she had to discard more than $10,000 in personal property from her basement because of its exposure to asbestos. Compensatory damages for monetary harm are recoverable under § 1983. *See Memphis Cmty. Sch. Dist. v. Stachura*, 477 U.S. 299, 307 (1986). Defendants did not respond to this argument. They did recognize the property loss as a possible harm in a footnote, but failed to explain why this does not constitute an injury in Wright's federal or state-law claims. We note that neither Banks nor Goins claims to have suffered any loss of personal property because of asbestos exposure.

Next, we must decide whether medical monitoring is a compensable injury under § 1983. The text of § 1983 does not provide the answer. Consequently, we apply the analysis mandated by 42 U.S.C. § 1988 to determine if medical monitoring may be properly pled as damages under § 1983. *See Fontroy v. Owens*, No. 86-4958, 1996 WL 571149, at *3 (E.D. Pa. Oct. 2, 1996), *aff'd*, 150 F.3d 239 (3d Cir. 1998) (applying § 1988 to determine whether damages for emotional distress is permitted under § 1983). Section 1988 sets forth a three-step process for identifying sources of law when the relevant rule is absent. *Burnett v. Grattan*, 468 U.S. 42, 47-48 (1984). Initially, the courts must determine whether the civil rights statutes themselves provide a rule that carries the statutes into effect. If the statutes contain a deficiency, the court then looks to the state law of the forum to fill the gap. Finally, the court applies state law only if it is not "inconsistent with the Constitution and laws of the United States." *Id.* at 48 (quoting § 1988); *see Fontroy*, 153 F.3d at 24. "In resolving questions of inconsistency between state and federal

law raised under § 1988, courts must look not only at particular federal statutes and constitutional provisions, but also at 'the policies expressed in [them].'" *Robertson v. Wegmann*, 436 U.S. 584, 590 (1978) (citations omitted).

In *Fontroy*, the court undertook this three-step inquiry to address the issue of whether § 1983 permitted the recovery of monetary damages for fear of contracting cancer from the exposure to asbestos absent physical injury. 1996 WL 571149, at *3. After determining that the federal civil rights statutes do not contain an applicable rule, the court looked to a Pennsylvania Supreme Court decision, which held that the fear of asbestos-related cancer is not a compensable injury. *Id.* (citing *Simmons*, 674 A.2d at 238). Since this rule of law was neither inconsistent with federal law nor inimical to the policies underlying § 1983, the court applied Pennsylvania law to the plaintiff's constitutional claim. *Id.* at *4.

In this case, Plaintiffs cite the case of *Redland Soccer Club, Inc. v. Department of the Army*, 696 A.2d 137 (Pa. 1997), a Pennsylvania Supreme Court decision, in support of their argument that medical monitoring is an actionable harm under § 1983. Defendants counter that physical injury is a prerequisite to recovery. Defendants also contend that the United States Supreme Court case *Metro-North Commuter R.R. v. Buckley*, 521 U.S. 424 (1997) militates against Plaintiffs' argument. While the parties do analyze these authorities, they do not address the legal framework set forth in § 1988, within which Congress requires the courts to identify sources of law under the civil rights statutes. We will apply the § 1988 framework to the arguments of the parties.

As noted above, federal law does not specify whether § 1983 allows for the recovery of damages in the form of medical monitoring. *See Fontroy*, 1996 WL 571149, at *3. We therefore turn to Pennsylvania law to fill the void left by federal law. The Pennsylvania Supreme

11

Court recognizes damages for expenses incurred for medical monitoring. *Simmons*, 674 A.2d at 239-40; *Redland*, 696 A.2d at 145-46. In *Simmons*, the Court, relying in part on the reasoning of a Third Circuit case, recognized that recovery for medical monitoring is "appropriate and just." However, *Simmons* involved plaintiffs diagnosed with asymptomatic pleural thickening caused by occupational exposure to asbestos. 674 A.2d at 239 (citing *In re Paoli R.R. Yard PCB Litig.*, 916 F.2d 829 (3d Cir. 1990)). In *Redland*, when the plaintiffs sought the creation of a medical monitoring trust fund, the Court determined that a common-law claim for medical monitoring exists in Pennsylvania. 696 A.2d at 139-40, 145. The Court in *Redland* determined that to prevail on a common-law claim for medical monitoring, a plaintiff must prove the following elements:  1) exposure greater than normal background levels; 2) to a proven hazardous substance; 3) caused by the defendant's negligence; 4) as a proximate result of the exposure, plaintiff has a significantly increased risk of contracting a serious latent disease; 5) a monitoring procedure exists that makes the early detection of the disease possible; 6) the prescribed monitoring regime is different from that normally recommended in the absence of the exposure; and 7) the prescribed monitoring regime is reasonably necessary according to contemporary scientific principles. *Id.* at 145-46. Contrary to Defendants' suggestion, there is nothing in these elements that requires Plaintiffs to manifest physical symptoms of asbestos exposure before they may recover the cost of medical monitoring.[5]

---

[5] Defendants cite *Simmons* in support of their argument that a medical monitoring claim requires physical symptoms. *Simmons*, however, did not articulate the elements of a medical monitoring cause of action. The court recognized medical monitoring as a viable tort, but the plaintiffs did not seek relief on that ground. *Simmons* ,674 A.2d at 239-40. In *Redland*, the court for the first time announced the elements of the tort. 696 A.2d at 145-46. Plaintiffs point out, and we agree, that there is no requirement that the plaintiff manifest physical symptoms from the exposure to the hazardous substance. *Id.* at 144 ("'The injury in a medical monitoring claim is the cost of the medical care.'" (quoting *In re Paoli*, 916 F.2d at 850)). Defendants do not respond to this argument.

The final step of the inquiry focuses on the predominance of the federal interest: courts are to apply state law only if it is consistent with the Constitution and federal law. *Burnett*, 468 U.S. at 48. In *Buckley*, the Supreme Court held that a railroad worker who was negligently exposed to asbestos, but without any physical symptoms, could not recover for negligent infliction of emotional distress under the Federal Employers' Liability Act ("FELA"), 45 U.S.C. §§ 51 *et seq.* 521 U.S. at 426-27. The plaintiff also sought, and the Second Circuit permitted, lump-sum damages for related medical costs. *Id.* at 438-40. The parties in *Buckley* did not dispute that an exposed plaintiff can recover reasonable medical monitoring costs if and when symptoms develop. *Id.* at 438. As for the question before the Court—whether medical costs arising out of the negligent exposure to a toxic substance constitute a sufficient basis for tort recovery—there were no other FELA decisions on point.

The Court in *Buckley* surveyed state-law cases, including the Third Circuit case applying Pennsylvania law relied upon by *Simmons,* to answer this question. *Id.* at 440 (reviewing cases, including *In re Paoli*, 916 F.2d 829). The Court found that the state-law cases that permitted recovery did not endorse a traditional cause of action for lump-sum damages. *Id.* at 440-41. Instead, the courts in these cases imposed special limitations on the medical monitoring recovery, such as creating court-supervised funds. *See, e.g.*, *Ayers v. Jackson*, 525 A.2d 287, 314 (N.J. 1987); *Hansen v. Mountain Fuel Supply Co.*, 858 P.2d 970, 982 (Utah 1993).

After weighing the competing considerations—the difficulty in determining the necessary extra monitoring costs, the potential to flood the docket with less important cases, the presence of existing alternative sources of payment, the economic burden placed on a plaintiff, and the mitigated costs of preventive care—the *Buckley* Court held that the plaintiff was not entitled to an award of lump-sum damages for medical monitoring under FELA. 521 U.S. at 440-44. The

13

Court specifically noted, however, that its holding was limited to damages of the type sanctioned by the Second Circuit. *Id.* at 444 ("We need not, and do not, express any view here about the extent to which the FELA might, or might not, accommodate medical cost recovery rules more finely tailored than the rule we have considered.").

Thus, Pennsylvania law permits recovery for medical monitoring absent physical injury, and the United States Supreme Court, at least when applying FELA in the context of lump-sum damages, does not. Section 1988 requires courts to apply the state law unless it is inconsistent with federal statutes and constitutional provisions, or the policies expressed therein. We are satisfied that the applicable Pennsylvania law is consistent with federal law. When the Pennsylvania Supreme Court articulated the elements of a common-law medical monitoring cause of action in Pennsylvania, it did so in the context of establishing a medical monitoring trust fund. *See Redland*, 696 A.2d at 147. The United States Supreme Court has not offered an opinion on the viability of medical monitoring trust funds as a form of damages. Rather, in *Buckley*, the Court specifically expressed its reluctance to adopt a tort rule permitting the recovery of lump-sum damages absent physical injury. 521 U.S. at 440. Therefore, Pennsylvania law and federal law do not conflict here because the medical monitoring tort under Pennsylvania law, which permits the creation of a supervised fund, can be reconciled with *Buckley*, which prohibits a plaintiff without physical injury from recovering lump sum damages for medical monitoring.

Since Pennsylvania law and federal law can be reconciled, we will apply Pennsylvania law to fill the gaps left by § 1983, in accordance with § 1988. To the extent that Plaintiffs seek to establish a fund for financial expenses for increased medical monitoring because of their exposure to asbestos, they have suffered an actionable harm compensable under § 1983.

Although Plaintiffs do not use the magic word "fund," they do request "annual medical monitoring." Insofar as Plaintiffs demand lump-sum damages, this form of relief has not been recognized by the Pennsylvania Supreme Court and has been expressly rejected by the United States Supreme Court. Plaintiffs, therefore, may not recover lump-sum damages.

**B.      Count II - State-Created Danger Claim (Count II)**

For ease of analysis, we address the state-created danger claim first. Plaintiffs allege that Defendants' affirmative conduct violated their rights under the First, Fifth, and Fourteenth Amendments. At the outset, we must dismiss Plaintiffs' § 1983 state-created danger claim to the extent that it relies on the First and Fifth Amendments. Plaintiffs assert no basis of recovery under the First Amendment. Moreover, the Fifth Amendment restricts federal government action, *see Nguyen v. U.S. Catholic Conference*, 719 F.2d 52, 54 (3d Cir. 1983), and this case only involves state actors. Plaintiffs do not respond to these arguments made by Defendants. (*See* Pls.' Resp.) We will confine ourselves to the Fourteenth Amendment.

1.      *State-Created Danger Claim*

The Due Process Clause of the Fourteenth Amendment provides that "[n]o State . . . shall deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV § 1. Generally, the Due Process Clause is not violated where the state fails to protect its citizens from harm. *DeShaney v. Winnebago Cnty. Dep't of Social Servs.*, 489 U.S. 189, 195, 202 (1989) (recognizing that the Due Process Clause "forbids the State itself [from] depriv[ing] individuals of life, liberty or property without 'due process of laws' but its language cannot fairly be extended to impose an affirmative obligation on the State to ensure that those interests do not come to harm through other means"). However, under the state-created danger theory, the state may be subject to liability when it "'acts in a way that makes a person substantially more

15

vulnerable to injury from another source than he or she would have been in the absence of state intervention.'"   *Perez ex rel. Estate of Perez v. City of Phila.*, 701 F. Supp. 2d 658, 664 (E.D. Pa. 2010) (quoting *Schieber v. City of Phila.*, 320 F.3d 409, 416 (3d Cir. 2003)).

The four elements of a state-created danger claim are:  1) the harm ultimately caused was foreseeable and fairly direct; 2) a state actor acted with a degree of culpability that shocks the conscience; 3) a relationship between the state and the plaintiff existed such that the plaintiff was a foreseeable victim of the defendant's acts, or a member of a discrete class of persons subjected to the potential harm brought about by the state's actions, as opposed to a member of the public in general; and 4) a state actor affirmatively used his or her authority in a way that created a danger to the citizen or that rendered the citizen more vulnerable to danger than had the state not acted at all.  *Bright v. Westmoreland Cnty.*, 443 F.3d 276, 281 (3d Cir. 2006) (citations omitted). Defendants argue that Plaintiffs' claim fails to satisfy the first, second, and fourth elements of the test.

As to the first element, Defendants reiterate that Plaintiffs suffered no foreseeable harm. Defendants correctly argue that emotional distress and the fear of disease, absent physical injury, do not qualify as legal harms.  However, for the reasons stated above, we reject Defendants' interpretation of Plaintiffs' injury.  Accepting the facts in Plaintiffs' Complaints as true, it is evident that the PHA maintenance crew, acting in accordance with PHA policies, caused asbestos to become airborne in Wright's basement when repairing leaking pipes, and that the asbestos seeped into the apartments of Goins and Banks.  Plaintiffs claim two direct harms as a result of their asbestos exposure:  medical monitoring and property damage.  These harms were also foreseeable.  "[A] harm is foreseeable when a state actor has actual awareness, based on concrete information, of a risk of harm to an individual or class of individuals such that the actor

is on notice that his or her act or failure to act significantly enhances that risk of harm." *Gremo v. Karlin*, 363 F. Supp. 2d 771, 784 (E.D. Pa. 2005). Plaintiffs allege that the PHA maintenance crew was aware that airborne asbestos poses health risks to those who are exposed to it. The PHA maintenance crew was therefore on notice that causing asbestos to become airborne in Wright's apartment could harm those who were exposed to the asbestos. We are satisfied that Plaintiffs sufficiently allege that Wright's property loss and Plaintiffs' costs of medical monitoring are direct and foreseeable consequences of Defendants' conduct.

Defendants also argue that their conduct does not shock the conscience. According to Defendants, Plaintiffs' allegations instead closely resemble an ordinary negligence claim. To determine whether a defendant's conduct reached the level of shocking the conscience, courts evaluate the conditions under which a defendant acted. *Kaucher v. Cnty. of Bucks*, 455 F.3d 418, 426 (3d Cir. 2006) (citing cases). Where a defendant is "confronted with a hyperpressurized environment such as a high-speed chase . . . it is usually necessary to show that the officer deliberately harmed the victim." *Id.* (citations omitted). However, where a defendant proceeds in a deliberate fashion, as is the case here, "deliberate indifference may be sufficient to shock the conscience." *Estate of Smith v. Marasco*, 430 F.3d 140, 153 (3d Cir. 2005) (internal quotation marks and citations omitted).

Plaintiffs allege that the PHA maintenance crew acted with deliberate indifference. The PHA maintenance crew knew full well that they had caused asbestos to become airborne in Wright's basement through their handling and disposal of the pipe insulation. They knew that asbestos was a hazardous substance. Nevertheless, they did not inform Wright of the asbestos, as was allegedly PHA's policy. Instead, they placed the asbestos back into the basement wall and advised Wright that she had nothing to worry about, even when she asked about "the little white

stuff floating in the air." Likewise, the PHA maintenance crew did not inform Goins or Banks of the presence of asbestos in Wright's basement, even though their basements were also exposed to the asbestos-laden air in Wright's basement while the repairs were being done. As a result, Plaintiffs continued to live in this asbestos-infested environment for months. Asbestos has been known to be a highly toxic, dangerous, and disease-producing substance for many decades. Under these circumstances, it cannot be reasonably argued that the PHA maintenance crew did not act with deliberate indifference that shocks the conscience.

Finally, Defendants contend that Plaintiffs fail to sufficiently allege the fourth element of the test—whether the state actor affirmatively created the danger. This element may be broken down into three necessary conditions:  1) a state actor exercised his or her authority; 2) the state actor took an affirmative action; and 3) this act created a danger to the citizen or rendered the citizen more vulnerable than if the state had not acted at all. *Ye v. United States*, 484 F.3d 634, 639 (3d Cir. 2007).

Defendants do not contend that Plaintiffs fail to satisfy this element as to PHA and Emmitt. They argue that Plaintiffs do not sufficiently allege that Defendants Greene, Kelly, Carter, Quimby, Caldwell, and Tillman took affirmative acts that placed Plaintiffs in danger.[6] According to the Complaint, Greene, Kelly, Carter, Quimby, Caldwell, and Tillman were all in managerial or supervisory roles, and were not directly involved in the incident giving rise to this action.[7]  Plaintiffs allege that these Defendants "promulgated policies, plans, procedures, rules

---

[6] Although Goins and Banks do not explicitly argue that Kelly did not take an affirmative act, they allege Kelly is liable under the theory of successor liability because he was Greenee's successor.  (Goins Motion to Dismiss 4 n.3.)  Therefore, where Plaintiffs make an argument as to Greenee, we will also apply it to Kelly.

[7] Greenee was the Executive Director of the PHA, Kelly was PHA's successor Executive Director, Carter was PHA's Assistant Director of Operations, Quimby was PHA's Executive General Manager of Operations, Caldwell was PHA's Executive General Manager of Property

and regulations concerning PHA's activities with respect to the inspection, detection, removal and disposal of asbestos materials." (*Id.* at ¶ 15.)   Plaintiff also alleges that Tillman allegedly gave a statement to the Daily News denying the presence of asbestos at Wright's apartment, characterizing Smith as simply a "disgruntled employee." (*Id.* at ¶ 52.)  Emmitt directed a PHA maintenance worker—Rudy Barbosa—and a PHA construction worker—Robert Smith—to repair the leaky pipe in Wright's basement when the PHA workers encountered asbestos.  Smith and Barbosa confronted Emmitt about the asbestos, noting the danger it presented.  Despite these concerns, Emmitt advised the workers to scoop the asbestos back into hole in the wall, and cover the hole with drywall.  (*Id.* ¶¶ 26-29.)

Because respondeat superior does not apply to § 1983 claims, Plaintiff must allege facts sufficient to show that each of the individual PHA Defendants had personal involvement in the alleged constitutional harm.  *See Iqbal*, 556 U.S. at 676 (noting that, because vicarious liability is inapplicable to § 1983 suits, "a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution"); *Baraka v. McGreevey*, 481 F.3d 187, 210 (3d Cir. 2007) ("A defendant in a civil rights action must have personal involvement in the alleged wrongs to be liable, and cannot be held responsible for a constitutional violation which he or she neither participated in nor approved.") (internal quotation marks and citations omitted).  Personal involvement can be established with facts showing that the defendant personally directed or actually participated in the misconduct, or with facts showing that the defendant had knowledge of and acquiesced in the misconduct.  *Brito v. United States Dep't of Justice*, 392 F. App'x 11, 14 (3d Cir. 2010) (citing *Rode v. Dellarciprete*, 845 F.2d 1195, 1207 (3d Cir. 1988)).

---

Management Operations, and Tillman was PHA's General Manager of Communications. (Compl. ¶¶ 8-13.)

Plaintiffs' allegations against Greene, Kelly, Carter, Quimby, Caldwell, and Tillman center on these Defendants' roles as PHA managers and supervisors. In the Third Circuit, there are two theories of supervisory liability:

> one under which supervisors can be liable if they established and maintained a policy, practice or custom which directly caused the constitutional harm, and another under which they can be liable if they participated in violating plaintiff's rights, directed others to violate them, or, as the persons in charge, had knowledge of and acquiesced in their subordinates' violations.

*Santiago v. Warminster Twp.*, 629 F.3d 121, 129 n.5 (3d Cir. 2010) (internal quotation marks omitted).  Plaintiffs' claims against Greene, Kelly, Carter, Quimby, Caldwell, and Tillman fall under the first theory of supervisory liability—that these Defendants established  and maintained an unconstitutional policy, practice or custom concerning the treatment of asbestos materials. Plaintiffs allege that these policies, which Emmitt and the PHA maintenance crew knowingly followed, created a danger to Plaintiffs by exposing them to asbestos in their homes for months. Defendants argue that Plaintiffs only make generalized assertions as to Defendants' role in the adoption of such asbestos policies.  Notwithstanding the general nature of these allegations, we are satisfied at this juncture that the allegations are sufficient to withstand the Motions as to Greene, Kelly, Carter, Quimby, Caldwell, and Tillman.  Prior to discovery, Plaintiffs are not required to spell out with great specificity the role of each Defendant.

As to Emmitt, the Complaint alleges sufficient facts revealing his personal involvement in the alleged constitutional harm.  Emmitt was the supervisor at the scene when the incident took place.  When the PHA maintenance workers advised Emmitt about the presence of asbestos, he directed that the workers place the asbestos back into the wall of Wright's basement and cover it with drywall.

20

2.     *Qualified Immunity*

Each of the individual Defendants is named in his or her individual and official capacities.  Where a suit is brought against a public official in his or her official capacity, the suit is treated as if it were brought against the employing governmental entity.  *See McGreevy v. Stroup*, 413 F.3d 359, 369 (3d Cir. 2005) (quotations omitted).  Because Plaintiffs bring suit directly against PHA–the employing government entity here–the claims against the individual Defendants in their "official capacities" are duplicative.

As to the claims brought under § 1983 against Defendants Greene, Kelly, Carter, Quimby, Caldwell, Emmitt, and Tillman in their individual capacities, Defendants raise the affirmative defense of qualified immunity.  The doctrine of qualified immunity shields state officials from constitutional liability insofar as "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).  A court evaluating a claim of qualified immunity "must first determine whether the plaintiff has alleged the deprivation of an actual constitutional right at all, and if so, proceed to determine whether that right was clearly established at the time of the alleged violation."  *Conn v. Gabbert*, 526 U.S. 286, 290 (1999).

We have already determined that Plaintiffs were deprived of a constitutional right of due process.  Within the contours of the Due Process Clause, this right can be broadly described as the right to be free from bodily integrity from state-created danger of asbestos exposure.  *See Estate of Lagano v. Bergen Cnty. Prosecutor's Office*, 769 F.3d 850, 858 (3d Cir. 2014) (recognizing that "[i]ndividuals have a constitutional liberty interest in personal bodily integrity that is protected by the Due Process Clause of the Fourteenth Amendment"); *L.R. v. Sch. Dist. of Phila.*, --- F. Supp. 3d ---, 2014 WL 6490756, at *11 (E.D. Pa. 2014) (holding that the plaintiff

had a constitutional right under the Fourteenth Amendment to bodily integrity from the defendant under the state-created danger theory).

Having concluded that Plaintiffs alleged the deprivation of an actual constitutional right under the state-created danger doctrine, we must proceed to the second step of qualified immunity—whether this constitutional right was clearly established at the time the violation occurred.[8]  The principle underlying the second step of the analysis is notice.  *See Hope v. Pelzer*, 536 U.S. 730, 739 (2002).  The constitutional right must be "sufficiently clear and well-defined so that 'a reasonable official would understand that what he is doing violates that right.'" *Gremo v. Karlin*, 363 F. Supp. 2d 771, 791 (E.D. Pa. 2005) (quoting *Carswell v. Borough of Homestead*, 381 F.3d 235, 242 (3d Cir. 2004)).

The Third Circuit has recently stated that a due process interest may be "clearly established" even in the absence of precedential case law on point.  *Lagano*, 769 F.3d at 858 ("[The plaintiff] can overcome [the defendant's] qualified immunity defense without proving that we have previously issued a binding decision recognizing a state-created danger in the context of the disclosure of a confidential informant's status, and the District court erred in requiring it to do so.").

---

[8] Plaintiffs point to the Toxic Substances Control Act ("TSCA"), 15 U.S.C. §§ 2601 *et seq.*, ostensibly as a source of clearly established federal law that bars qualified immunity. While the violation of a federal statute may form the basis of a § 1983 claim, *Wright v. City of Roanoke Redevelopment & Housing Auth.*, 479 U.S. 418, 423 (1987), Plaintiffs do not argue that the TSCA is enforceable under § 1983.  Indeed, the TSCA does not provide individuals with a private right of action for damages.  Where Congress forecloses the filing of a private cause of action, a plaintiff may not bring a § 1983 claim to enforce a federal statute.  *See Wright*, 479 U.S. at 423; *Hurt*, 806 F. Supp. at 524.  Since Defendants did not deprive Plaintiffs of any actual constitutional rights under the TSCA, we need not consider whether the purported right was clearly established.

In this case, there is no binding Third Circuit precedent recognizing a state-created danger claim on the facts presented here.[9]  However, this does not end the analysis.  "Instead of conducting a 'fact-by-fact' match up," *L.R.*, 2014 WL 6490756, at *11, we must focus our inquiry on the second prong on "whether it would be clear to a reasonable [government official] that the alleged [release] was unlawful under the circumstances."  *Lagano*, 769 F.3d at 859.

In *L.R. v. School District of Philadelphia*, Judge DuBois recently concluded that a plaintiff's due process right to bodily integrity was clearly established in the absence of any factually-similar binding Third Circuit decision.  In that case, plaintiff, a parent of a kindergartener in the Philadelphia School District, brought a claim against the school district and a teacher for releasing her daughter to a stranger, a decision that ultimately led to the child's exposure to sexual assault.  Recognizing the Third Circuit's recent departure from requiring precedential authority on point to inform the "clearly established" prong of the qualified immunity analysis, the district court relied on the broader inquiry established in *Lagano* that a right is clearly established if it would have been clear to a reasonable government official that the conduct was unlawful.  2014 WL 6490756, at *11-12.  The court recognized that although the Fourteenth Amendment does not require the state to affirmatively act to protect its citizens, it does create an obligation to avoid placing its citizens in danger.

_____

[9] There is, however, a case in the Sixth Circuit factually similar to this case that provides some guidance to the analysis.  *See Upsher v. Grosse Pointe Pub. Sch. Sys.*, 285 F.3d 448 (6th Cir. 2002).  Although *Upsher* was not a state-created danger case and did not specifically address qualified immunity, it is useful in determining if Defendants had notice that the right at issue here was clearly established.  In *Upsher*, school custodians brought § 1983 claims against the school after they were exposed to friable asbestos because the school directed them to remove asbestos tiles from a school building.  *Id.* at 450.  The plaintiffs claimed they suffered from respiratory irritations and other physical problems from the asbestos exposure.  *Id.* at 450-51.  The Sixth Circuit found that while the plaintiffs' complaint adequately alleged § 1983 claims, the plaintiffs' claims failed at the summary judgment stage because the plaintiffs did not show that the defendants made a deliberate decision to inflict pain or bodily injury on any of the plaintiffs.  *Id.* at 453.

Here, we are satisfied that it would have been clear to a reasonable PHA employee that causing the release of airborne asbestos in Plaintiffs' home and then failing to notify Plaintiffs or acting in any way to mitigate the harm caused by the release, was unlawful under the circumstances.  The Third Circuit recognized the state-created danger theory for the first time in *Kneipp v. Tedder*, 95 F.3d 1199 (3d Cir. 1996), more than 10 years before the incident giving rise to this litigation.  Defendants' conduct is precisely what caused the danger in this instance. Defendants cannot possibly claim that they were unaware about the risks associated with asbestos.  In 2003, the Third Circuit stated that "[t]he dangers of asbestos are well established and require no reaffirmation or additional proof."  *Brennan v. Norton*, 350 F.3d 399, 415 (3d Cir. 2003).  Congress recognized asbestos to be a dangerous toxic chemical in the 1970s, decades before the incident in this action occurred.[10]  The health effects associated with asbestos exposure have been within the public's knowledge for years.  We are satisfied that Plaintiffs' constitutional right to bodily integrity as it related to the state-created danger of prolonged asbestos exposure was clearly established at the time the constitutional deprivation occurred. Qualified immunity does not apply in this case.

### 3.    PHA's Liability

As a public housing authority, PHA qualifies as a government entity, specifically a municipal corporation, for the purposes of § 1983.  *Watson v. Phila. Hous. Auth.*, 629 F. Supp. 2d 481, 485 (E.D. Pa. 2009).  As a municipal corporation, PHA cannot be subject to *respondeat superior* liability for a § 1983 violation.  *Bielevicz v. Dubinon*, 915 F.2d 845, 850 (3d Cir. 1990). Municipal liability "must be founded upon evidence that the government unit itself supported a

---

[10] In March of 1971, the Environmental Protection Agency identified asbestos as a hazardous air pollutant under the Clean Air Act.  36 Fed. Reg. 5931 (March 31, 1971).  In 1973, the EPA promulgated regulations, the National Emission Standards for Hazardous Air Pollutants ("NESHAP"), which included regulations on the handling of asbestos. 40 C.F.R. 61, Subpart M.

violation of constitutional rights." *Id.* Therefore, proving a constitutional violation of state actors under the state-created danger doctrine by itself is not enough to implicate municipal liability. *Nawuoh v. Venice Ashby Cmty. Ctr.*, 802 F. Supp. 2d 633, 639 (E.D. Pa. 2011); *M.B. ex rel. T.B. v. City of Phila.*, No. 00-5223, 2003 WL 733879, at *6 (E.D. Pa. Mar. 3, 2003) (citing *Kneipp*, 95 F.3d 1199); *Sciotto v. Marple Newton Sch. Dist.*, 81 F. Supp. 2d 559, 573 (E.D. Pa. 1999).

The Third Circuit has not specifically addressed what additional analysis must be conducted for municipal liability to attach under the state-create danger doctrine. *M.B. ex rel T.B.*, 2003 WL 733879, at *6; *Sciotto*, 81 F. Supp. 2d at 573. However, Courts in this district have addressed the issue and determined that the Third Circuit would require a Plaintiff to conduct an analysis under *Monell v. Department of Social Services of the City of New York*, 436 U.S. 658 (1978), to prove that some municipal policy or custom was the proximate cause of the constitutional violation under the state-created danger doctrine. *M.B. ex rel T.B.*, 2003 WL 733879, at *6; *Taxioly v. City of Phila.*, No. 97-1219, 1998 WL 633747, at *13 (E.D. Pa. Sept. 10, 1998) ("To impose § 1983 liability on the City or DHS, Plaintiffs must establish that a municipal policy or custom was the proximate cause of the violation.").

*Monell* provides the framework for determining whether a government entity such as PHA may be held liable under § 1983. *Bielevicz*, 915 F.2d at 850. Under *Monell*, "the municipality can only be liable when the alleged constitutional transgression implements or executes a policy, regulation or decision officially adopted by the governing body or informally adopted by custom." *Beck v. City of Pittsburgh*, 89 F.3d 966, 971 (3d Cir. 1996) (citing *Monell*, 436 U.S. 658). Plaintiffs must establish that the policy or custom was the proximate cause of the injuries sustained by demonstrating a "plausible nexus or "affirmative link" between the

municipality's custom and the specific deprivation of constitutional rights at issue. *Kneipp*, 95 F.3d 1199, 1213.

Here, Plaintiffs have sufficiently alleged that PHA had a policy and custom of failing to disclose the presence of asbestos in PHA properties and of improperly handling and disposing of asbestos found in PHA properties. Plaintiffs allege that when the PHA maintenance crew acted so as to create a danger to Plaintiffs in violation of their constitutional rights, the crew was acting pursuant to PHA's policies or customs. These allegations provide a plausible nexus between PHA's policies or customs and the underlying constitutional violation by the individual state actors. Plaintiffs have therefore satisfied the requirements to hold PHA liable under the state-created danger doctrine.

Accordingly, Plaintiffs have sufficiently alleged a state-created danger claim under the Fourteenth Amendment against Defendants PHA, Emmitt, Greene, Kelly, Carter, Quimby, Caldwell, and Tillman.

## C.     The *Monell* Claim (Count I)

Plaintiffs allege that all Defendants violated their constitutional rights under the theory announced in *Monell*.[11] The *Monell* claim must be dismissed insofar as it purports to hold Defendants Greene, Kelly, Carter, Quimby, Caldwell, Emmitt, and Tillman individually liable. *Monell* applies to the liability of government entities, not individuals.

Defendants argue that Plaintiffs fail to allege a constitutional violation. Defendants, quoting the Supreme Court, contend that there is no constitutional right to housing: "[w]e do not denigrate the importance of decent, safe and sanitary housing. But the Constitution does not

---

[11] For the reasons discussed above, the *Monell* claim must be dismissed to the extent that it is based on the First and Fifth Amendments. Plaintiffs implicitly agree. They pursue their *Monell* argument only as a substantive due process claim under the Fourteenth Amendment. (Pls.' Resp. 22-24.)

provide judicial remedies for every social and economic ill.  We are unable to perceive in that document any constitutional guarantee of access to dwellings of a particular quality." *Lindsey v. Normet*, 405 U.S. 56, 74 (1972).  Defendants rely on *Hurt v. Philadelphia Housing Authority*, where the plaintiffs, residents of housing units managed by PHA, brought suit alleging that they were exposed to lead paint.  806 F. Supp. 515, 519 (E.D. Pa. 1992).  The court rejected the argument that PHA had a constitutional duty to provide for plaintiffs' safety and welfare.  *Id.* at 523.  The court found that PHA did not violate any affirmative duty of care mandated by the Fourteenth Amendment's due process clause.  *Id.* (citing *DeShaney*, 489 U.S. at 199-200).

Plaintiffs admit that there is no constitutional right to housing.  (Pls.' Resp. 22.)  Instead, Plaintiffs style their argument as a substantive due process violation under the state-created danger doctrine.  (*Id.*)  We have discussed PHA's liability under the state-created danger doctrine using the *Monell* analysis.  We find that Count I advances the same theory of municipal liability.  *Cole ex rel. Cole v. Big Beaver Falls Area Sch. Dist.,* No. 08-776, 2009 WL 890578, at *7 (W.D. Pa. Mar. 26, 2009) ("Municipal liability is not an alternate theory of liability; it is an additional hurdle that must be overcome by a plaintiff in establishing § 1983 liability of a municipality.");  *M.B. ex rel T.B.*, 2003 WL 733879, at *6 (finding state-created danger theory analysis and *Monell* analysis are not alternative theories of municipal liability).  *But see Sciotto*, 81 F. Supp. 2d at 573 (finding "policy, practice, or custom" theory is an alternative theory to the state-created danger theory).  Plaintiffs have cited no other constitutional violation on which municipal liability could be based.  Therefore, we are compelled to conclude that the *Monell* claim in Count I is duplicative of the state-created danger claim in Count II as to PHA.  Count I will be dismissed.

### D.        Count III - Annual Medical Monitoring Claim

Plaintiffs bring a medical monitoring claim against all Defendants under § 1983.  We are unaware of a federal cause of action for medical monitoring.  We have determined that Plaintiffs are permitted to claim damages under § 1983 in the form of medical monitoring.  Accordingly, a separate cause of action seeking the same damages is duplicative and will be dismissed.

### E.        Counts IV-VII

In Counts IV-VII, Plaintiffs assert violations of § 1983, the Pennsylvania Constitution, and Pennsylvania law.  Each Count is premised on the same sources of law but is asserted against different Defendants.  Count IV is against PHA, Count V is against Greene, Carter, Quimby, and Caldwell, Count VI is against Emmitt, and Count VII is against Tillman.[12]

These claims must be dismissed insofar as they rely on the First and Fifth Amendments. They must also be dismissed to the extent they allege violations of the Pennsylvania Constitution and Pennsylvania statutes and regulations under § 1983.  A violation of state law cannot form the basis of a § 1983 claim.  *Elkin v. Fauver*, 969 F.2d 48, 52 (3d Cir. 1992).  In addition, Plaintiffs acknowledge in their Response that the state and municipal sources of law cited in the Complaint do not create private rights of action for monetary damages.[13]  Plaintiffs also purport to bring a § 1983 claim to enforce provisions of the Clean Air Act, 42 U.S.C. §§ 7401 *et seq*.  This claim has been foreclosed by the Supreme Court, which has held that individuals may not enforce the various federal environmental statutes by resort to § 1983.  *Middlesex Cnty. Sewerage Auth. v. Nat'l Sea Clammers Ass'n*, 453 U.S. 1, 19-21 (1981); *see also Powell v. Lennon*, 914 F.2d 1459,

---

[12] Count V is also asserted against Kelly in the Goins Complaint.  (Goins Compl.)

[13] Plaintiffs identify the following sources of state and municipal law:  1) Pennsylvania Constitution; 2) 25 Pa. Code. §§ 271 *et seq.*; 3) Pennsylvania Asbestos Occupations Abatement Accreditation and Certification Act, 63 Pa. Stat. §§ 2101 *et seq.*; and 4) Philadelphia Code § 6-610.  In their Response, Plaintiffs note that "the various laws and regulations cited in the Amended Complaint admittedly provide no private right of action."  (Pls.' Resp. 21.)

1462 n.7 (11th Cir. 1990) (observing that there is no private right of action under the Clean Air Act after *Middlesex County*).  Plaintiffs have abandoned all of these arguments in their Response. (Pls.' Resp. 21.)

The remaining legal basis for recovery under Counts IV-VII is the Fourteenth Amendment's substantive due process clause. After discarding Plaintiffs' improper legal arguments, we are left with substantive due process claims that are largely identical to Plaintiffs' state-created danger claim in Count II.   As a result, Counts IV-VII are duplicative and will be dismissed.

### F.      Pendent State-Law Claims

Plaintiffs assert three pendent state-law claims against all Defendants:  1) gross and reckless negligence; 2) battery; and 3) future medical monitoring.  PHA and the individual Defendants argue that they are immune from liability pursuant to the Sovereign Immunity Act, 42 Pa. Cons. Stat. § 8522.  PHA is a Commonwealth agency that qualifies for sovereign immunity.  *Rhoads v. Phila. Hous. Auth.*, 978 A.2d 431, 432 (Pa. Commw. Ct. 2009).  Individual defendants, employees of a Commonwealth agency, enjoy the same immunity as PHA.  *Walker v. Phila. Hous. Auth.*, No. 08-5592, 2009 WL 3055389, at *3 (E.D. Pa. Sept. 24, 2009) (citing 42 Pa. Cons. Stat. § 8501).

Plaintiffs neglect to address any of Defendants' argument that sovereign immunity precludes liability and demands dismissal of the state-law claims.  We construe Plaintiffs' silence as their concession that the state law claims are barred by sovereign immunity.[14]

---

[14] Even if Plaintiffs had made an attempt to save their state-law claims, it appears as though those claims would nevertheless be barred by sovereign immunity.  Section 8522(b) specifically enumerates nine exceptions to immunity:  vehicle liability, medical-professional liability, care or control of personal property, Commonwealth real estate, highway conditions, care and control of animals, liquor store sales, National Guard activities, and vaccines.

Accordingly, Defendants' Motions to Dismiss Count VIII will be granted.

## IV. CONCLUSION

For all of these reasons, Defendants' Motions to Dismiss are granted in part and denied in part.  The *Monell* claim against the PHA in Count II and the state-created danger claim against the individual Defendants in Count II survive these Motions.  The remaining Counts will be dismissed.

An appropriate Order follows.

**BY THE COURT:**

**R. BARCLAY SURRICK, J.**

---

The only exception that appears, at first glance, to be relevant here is the real estate exception.  Under that exception, immunity does not apply when damages arise out of "[a] dangerous condition of Commonwealth agency real estate and sidewalks, including Commonwealth-owned real property."  42 Pa. Cons. Stat. § 8522(b)(4).  However, after reviewing the relevant case law, we are satisfied that Plaintiffs' state-law claims do not fall within the real estate exception.  The focus of the real estate exception inquiry is on whether the dangerous condition or defect itself causes an injury to occur.  *Thornton v. Phila. Hous. Auth.*, 4 A.3d 1143, 1148 (Pa. Commw. Ct. 2010); *Snyder v. Harmon*, 562 A.2d 307, 312 (Pa. 1989); *Williams v. Phila. Hous. Auth.*, 873 A.2d 81, 86 (Pa. Commw. Ct. 2005) (noting that in order for the real estate exception to apply, "it must be the dangerous condition or defect in the real estate that causes the injury.  If a defect merely facilitates an injury to be caused by the acts of other persons, the defect or dangerous condition is not actionable").

Here, Plaintiffs never allege that their property was defective; rather, they allege that Defendants' conduct and policies caused them to be unlawfully exposed to asbestos. This is not sufficient for the exception to apply.  *See Weckel v. Carbondale Hous. Auth.*, 20 A.3d 1245, 1250 (Pa. Commw. Ct. 2011) ("If a defect or dangerous condition merely facilitates an injury which is caused by the acts of a person, the defect or dangerous condition is not actionable.").